UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* DEVONTAE BROOKS, | ) ) ) | |
| Plaintiff, | ) ) | No. 17 C 1237 |
| v. | ) ) | Judge Coleman |
| WELLS FARGO BANK, N.A., | ) ) | |
| Defendant. | ) | |

**THE UNITED STATES' STATEMENT OF INTEREST REGARDING
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Pursuant to 28 U.S.C. § 517,[1] the United States of America submits this Statement of Interest concerning two issues: (i) whether a request or demand for money or property made to the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "Government Sponsored Enterprises" or "GSEs") may constitute a "claim" under the False Claims Act ("FCA"), 31 U.S.C. § 3729(b)(2)(A)(ii)[2]; and (ii) the standard for materiality under the FCA following *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).[3]  The United States has a strong interest in ensuring the proper interpretation of the FCA, which is the government's primary tool to combat fraud and

---

[1] Although 28 U.S.C. § 517 authorizes the United States to file this Statement of Interest as it "attend[s] to the interests of the United States," we also concurrently are filing an unopposed motion for leave to file this statement.  United States' Unopposed Motion for Leave to File Statement of Interest (Sept. 11, 2018) (Dkt. 38).

[2] *See* Memorandum of Law in Support of Wells Fargo Bank, N.A.'s Motion to Dismiss the Amended Complaint ("Defendant's Motion to Dismiss"), at 14-20 (July 23, 2018) (Dkt. 25); Relator's Memorandum in Opposition to Defendant's Motion to Dismiss ("Relator's Opposition"), at 13-17 (Aug. 29, 2018) (Dkt. 36).

[3] *See* Defendant's Motion to Dismiss, at 20-22; Relator's Opposition, at 9-11.

recover losses due to fraud in federal programs. Additionally, even when the United States has not intervened, as is the case here, "it is nonetheless a real party in interest—which is to say that its financial interests are at stake." *U.S. ex rel. Lusby v. Rolls-Royce Corp.* 570 F.3d 849, 852 (7th Cir. 2009).

This Statement of Interest takes no position on the overall merits of the defendant's motion to dismiss, its argument pursuant to Federal Rule of Civil Procedure 9(b), or as to the sufficiency of the relator's allegations in the Amended Complaint. Rather, the United States submits this Statement of Interest to assist the court, if necessary, in analyzing the proper scope of a "claim" under the FCA, and to clarify the standard for materiality under the FCA. Should this court find it necessary to address the scope of section 3729(b)(2)(A)(ii), it should make clear that claims against the GSEs may give rise to FCA liability.

## I. Background

### A. The False Claims Act

The False Claims Act prohibits the submission of false or fraudulent claims for payment to the United states or the making of false statements for the purpose of causing a false claim to be paid. A person who violates the FCA is liable to the United States for civil penalties and for three times the amount of the government's damages. 31 U.S.C. § 3729(a)(1). Lawsuits to collect statutory damages and penalties may be brought either by the Attorney General of the United States, or by a private person (known as a relator) in the name of the United States, in an action commonly referred to as a *qui tam* lawsuit. 31 U.S.C. § 3730(a) and (b)(1); *see also Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 769-78 (2000). When a *qui tam* action is filed, the government may intervene and take over the case "within 60 days after it receives both the complaint and the material evidence and information," 31 U.S.C. §

2

3730(b)(2), or "at a later date upon a showing of good cause," 31 U.S.C. § 3730(c)(3). If the government declines to intervene, the relator conducts the litigation, and if a *qui tam* action results in a recovery, those proceeds are divided between the government and the relator. 31 U.S.C. § 3730(d).

A violation of the FCA occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). One definition of "claim" under the Act is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." *Id*. § 3729(b)(2)(A)(i). However, a request or demand not directly presented to the government may also be a "claim" under the FCA. The Act defines that term as:

> [A]ny request or demand, whether under a contract or otherwise, for money or property *and whether or not the United States has title to the money or property*, that . . . is made to a contractor, grantee, or other recipient, *if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded*.

31 U.S.C. § 3729(b)(2)(A)(ii) (emphasis added). The Act specifically excludes from the definition of "claim" only "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property." *Id*. § 3729(b)(2)(B). The italicized language above was added in 2009 when Congress amended the FCA in the Fraud

3

Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617. FERA's changes to the FCA were made, in part, to help protect from fraud the billions of federal dollars being quickly dispersed to shore up the housing market during the financial crisis. *See*, *e.g.*, S. REP. 111-10, at 8 (2009) (Congress explained that "the Federal Government ha[d] obligated and expended more than $1 trillion in an effort to stabilize our banking system and rebuild our economy . . . and [p]rotecting these funds from fraud and abuse must be among our highest priorities . . .").

### B. Fannie Mae and Freddie Mac

Fannie Mae and Freddie Mac are "government sponsored enterprises," private corporations established by Congress to facilitate home ownership through the provision and development of secondary markets for conventional mortgages. *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title VIII (Aug. 1, 1968) (establishing Fannie Mae as a "Government-sponsored private corporation"), codified at 12 U.S.C. § 1716b; Emergency Home Finance Act of 1970, Pub. L. No. 91-351, Titles II and III (July 24, 1970) (authorizing Fannie Mae to provide a secondary market for conventional mortgages and establishing Freddie Mac for similar purposes), Freddie Mac provisions codified at 12 U.S.C. § 1451 *et seq*.

In 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA), Pub. L. No. 110-289, 122 Stat. 2654, which, among other things, established the Federal Housing Finance Agency (FHFA) to provide oversight of the GSEs. HERA, § 1311(b)(2), codified at 12 U.S.C. § 4511(b)(2). Shortly thereafter, on September 7, 2008, the agency exercised its statutory authority to place the GSEs into FHFA-administered conservatorships. *See* 12 U.S.C. § 4617(a)(2) (authorizing Director of FHFA to be appointed GSEs' conservator). The Treasury Department exercised its authority under HERA to enter into preferred stock purchase agreements with the GSEs through their conservator, as well as taking other measures to maintain and fund the GSEs'

4

continuing operations. *See* 12 U.S.C. § 1719(g) (Treasury authority to purchase securities in Fannie Mae); 12 U.S.C. § 1455(l) (same, Freddie Mac). By 2012, Fannie Mae had received over $116 billion, and Freddie Mac $71 billion, of Treasury funds under the agreements with the Treasury Department. *See Data as of Q2 2018 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities* (GSE Draw Table), *available at* https://www.fhfa.gov/DataTools/Downloads/Documents/ Market-Data/Table_1.pdf (last visited Sept. 4, 2018).

## II. Discussion

### A. A Request or Demand for Money or Property Made to Fannie Mae or Freddie Mac May Constitute a "Claim."

This case involves allegations that defendant is liable under the FCA based on false claims it allegedly submitted to the Federal Housing Authority (FHA), Fannie Mae, and Freddie Mac. Defendant moved to dismiss arguing, *inter alia*, that relator failed to allege a claim for payment to the U.S. government or to a "contractor, grantee, or other recipient" pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii).[4] Specifically, the defendant asserts that the GSEs are not "officers, employees, or agents of the United States," as required by 31 U.S.C. § 3729(b)(2)(A)(i), nor are they a "contractor, grantee, or other recipient" under 31 U.S.C. § 3729(b)(2)(A)(ii). Further, Defendant asserts that even if the GSEs were considered "other recipients," the relator has not alleged that any money paid to the defendant was "spent or used on the Government's behalf or to advance a Government program or interest" or that the government "provides or has provided any portion of the money or property requested or demanded" or "will reimburse . . . any portion of the money

---

[4] The defendant appears to acknowledge that FHA is part of the government, but challenges the specificity of relator's allegations that false claims were made to FHA. This Statement of Interest takes no position as to the specificity of relator's allegations.

or property which is requested or demanded." Defendant's Motion to Dismiss, at 17-18. In Relator's Opposition, he appears to correctly concede that the GSEs are not "officers, employees, or agents of the United States," as required by 31 U.S.C. § 3729(b)(2)(A)(i), but argues that the GSEs are "other recipients" under 31 U.S.C. § 3729(b)(2)(A)(ii), that federal funds were provided to the GSEs to advance a Government's program or interest, and that Relator sufficiently alleged that the GSEs "payment of fraudulent claims" was tied to government losses. Relator's Opposition, at 14-17.

As amended in 2009, the FCA includes two definitions of the sort of "claim" that may give rise to liability under the statute. The first definition, in 31 U.S.C. § 3729(b)(2)(A)(i), requires that a demand or request be made upon the government. The second definition, in 31 U.S.C. § 3729(b)(2)(A)(ii), does not. Instead, it defines a "claim" as a request or demand made upon non-governmental third parties under certain conditions. Congress added this definition of "claim" in 2009, after concluding that several courts had inappropriately constricted the scope of FCA liability in cases where fraud upon third-party recipients of federal funds was resulting in loss to the government. 31 U.S.C. § 3729(b)(2)(A)(ii) defines "claim" as a request or demand made upon: (1) a "contractor, grantee, or other recipient"; (2) where "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest"; and (3) the government is providing or reimbursing "any portion of the money or property requested or demanded."

        **i.**    **A Request or Demand to a "Contractor, Grantee, or Other Recipient"**

There can be no dispute that a plaintiff could establish that the GSEs meet the first statutory criterion. By 2012, Fannie Mae had received over $116 billion, and Freddie Mac $71 billion, of Treasury funds under the preferred stock purchase agreements with Treasury. *See* GSE

6

Draw Table, *available at* https://www.fhfa.gov/DataTools/Downloads/Documents/ Market-Data/Table_1.pdf (last visited Sept. 4, 2018). Whether or not the GSEs' acceptance of Treasury funds in exchange for stock in accordance with legally binding contracts would render them "contractors" or "grantees," it certainly renders them "other recipients." Indeed, the capacious phrase "other recipient" suggests a congressional intent to cast a wide net, a reading supported by legislators' statements before FERA's passage that the amendments were designed to redress fraud with respect to government funds expended as part of the economic recovery efforts. *See*, *e.g.*, 155 Cong. Rec. S1679-01, 2009 WL 275706 (Sen. Leahy, introducing the bill) (criticizing court decisions "which limit the scope of the law and allow sub-contractors paid with government money to escape responsibility for proven frauds" and urging quick clarification of the FCA "in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis").[5] Thus, under the FCA as amended, a plaintiff could certainly establish that the GSEs were "contractor[s], grantee[s], or other recipient[s]" of federal funds. *See*, *e.g.*, *United States ex rel. Grubea v. Rosicki et al.*, 2018 WL 3091255, at *19 (S.D.N.Y. June 23, 2018) ("Because the Treasury provided $200 billion to the GSEs to stabilize the housing market following the mortgage crisis, the GSEs are 'other recipients' of federal funds within the meaning of § 3729.").

---

[5] *See also* 155 Cong. Rec. H5260-01, 2009 WL 1228046 (Rep. Sensenbrenner) (noting FERA's improvements to the FCA specifically, and stating that "[w]ith the U.S. Government relying on private contractors to disburse funds for everything from our Medicare prescription drug program to our war efforts in Iraq to the stimulus money, billions of Federal dollars are now in jeopardy" and that "[t]he bailouts that Congress is approving left and right, without proper transparency or accountability, only adds to the amount of government funds in jeopardy from the fraudsters"); 155 Cong. Rec. H5686-01, 2009 WL 1373400 (Rep. Scott) (stating that "the Fraud Enforcement and Recovery Act of 2009[] is a bill crafted to combat the financial fraud that contributed to causing, and worsening, our Nation's mortgage crisis").

### ii. Money or Property "Spent or Used on the Government's Behalf or to Advance a Government Program or Interest"

A plaintiff also could establish that a false claim made upon the GSEs was for "money or property . . . to be spent or used on the Government's behalf or to advance a Government program or interest." 31 U.S.C. § 3729(b)(2)(A)(ii). The enormous investment authorized by Congress to rescue the GSEs from anticipated failure, as a well as the statutory authority granted to and used by the FHFA to place the GSEs in conservatorship, indicate that Congress considers these entities to be serving critical government interests. *See* 12 U.S.C. § 1719(g) (Treasury authority to purchase securities in Fannie Mae); 12 U.S.C. § 1455(l) (same, Freddie Mac); 12 U.S.C. § 4617(a)(2) (authorizing Director of FHFA to be appointed GSEs' conservator). Indeed, Congress made clear that the Treasury Department's temporary, unlimited ability to purchase any obligations and other securities issued by the GSEs "on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine" is contingent upon the Secretary making an "[e]mergency determination" that such actions "are necessary to – (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." 12 U.S.C. §§ 1719(g) (Fannie Mae), 1455(l) (Freddie Mac). FHFA and Treasury Department statements also make clear that the preferred stock purchase agreements were entered into for the purpose of restoring investor confidence and preventing a larger collapse of the U.S. mortgage market and financial system more generally.[6] Moreover,

---

[6] *See Statement of FHFA Director James B. Lockhart*, September 7, 2008 at 2 (noting that in light of housing market deterioration, the GSEs "have been unable to provide needed stability to the market" and "to meet their affordable housing mission"); *Statement of Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers*, Sept. 7, 2008 at 1 (preferred stock purchase agreements necessary to "avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and [mortgage-backed securities]").

Congress's creation of the GSEs further evidences its desire to advance a functional secondary mortgage market and increase the affordability of home ownership. *See* 12 U.S.C. § 4501 ("The Congress finds that . . . [the GSEs] have important public missions that are reflected in the statutes and charter Acts establishing the Banks and the enterprises").

The totality of the circumstances surrounding the GSEs—the massive governmental outlays to them and that funding's stated purpose, in tandem with the statutory provisions permitting FHFA to become the GSEs conservator and the unique status of the GSEs as congressionally created private corporations—make clear that a sufficiently pleaded complaint could establish that the government-provided funds were being used by the GSEs to advance a governmental purpose or interest within the meaning of section 3729(b)(2)(A)(ii). *See*, *e.g.*, *Grubea*, 2018 WL 3091255, at *19 ("the Government's interest here was in keeping the GSEs afloat and ensuring that their mortgage operations could continue").

### iii. Government Provision of "Any Portion of the Money or Property Which is Requested or Demanded"

Finally, the preferred stock purchase agreements between each GSE and Treasury highlight that a complaint could establish that the government was to provide or reimburse "any portion of the money or property which is requested or demanded" from a GSE. 31 U.S.C. § 3729(b)(2)(A)(ii). As the plain language of the statute provides, where the government provides "*any* portion" of the demanded funds, there may be a "claim" under 3729(b)(2)(A)(ii). Congress's exclusion from the FCA's amended definition of "claim" of "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property," 31 U.S.C. § 3729(b)(2)(B), underscores the breadth of the types of claims Congress

9

intended to be redressable under section 3729(b)(2)(A). Indeed, this provision is the only specific exclusion from the definition of "claim," and suggests that Congress considered section 3729(b)(2)(A) to be broad in application.

Courts' interpretations of the pre-FERA definition of "claim"—which included an identical requirement that the United States provide or reimburse "any portion of the money or property which is requested or demanded," *see* 31 U.S.C. § 3729(c) (2008)—similarly indicate the breadth of section 3729(b)(2)(A). *See United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*, 562 F.3d 295, 303-305 (4th Cir. 2009) (concluding that demands made on a federal grantee, paid with a fund originally capitalized with federal and non-U.S. funds, were "claims" within the meaning of the FCA despite co-mingling since a "portion of [the payment] . . . was provided to the grantee by the U.S. government"); *see also United States ex rel. Yesudian* v. *Howard University*, 153 F.3d 731, 738-39 (D.C. Cir. 1998) (indicating that where 80% of a university's funds were provided by the federal government, "the likelihood is high that the government would suffer . . . loss if Howard were to pay a false claim" and suggesting the relevance of the percentage of federal funds in a grantee's overall budget and the extent of continuing contact post-grant between a grantee and the government). Importantly, the FCA "does not make the extent of [the funds'] safeguard dependent upon the bookkeeping devices used for their distribution." *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943).

Even so, here the preferred stock purchase agreements between each GSE and Treasury underscore the connection between the GSEs' payment of fraudulent claims and government losses. These agreements provide that GSEs can draw each quarter from Treasury their "deficient amount"—*i.e.*, the "amount, if any, by which . . . total liabilities of [the GSE] exceed . . . the total assets of Seller"—up to a specified limit. *See*, *e.g.,* Amended and Restated Senior Preferred Stock

Purchase Agreement at 2, 4 § 2.2, *available at* https://www.fhfa.gov/ Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-26_SPSPA_ FannieMae_RestatedAgreement_N508.pdf (last visited Sept. 4, 2018).[7]  Thus, every dollar added to the GSEs' bottom line by fraud is potentially passed along to the government, which is then centrally obligated to—and in fact repeatedly did—cover billions of the GSEs' net worth shortfall amounts between 2008 and 2012.  *See* GSE Draw Table, *available at* https://www.fhfa.gov/DataTools/Downloads/Documents/ Market-Data/Table_1.pdf (last visited Sept. 4, 2018).

This funding arrangement highlights that a well-pleaded complaint could make out an FCA case based on claims made on the GSEs.  Where a plaintiff asserts liability based on claims made on an entity receiving federal funding, questions arise concerning whether "any portion" of a particular demand has been satisfied with that funding.  *See Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012) (concluding that "[t]he FCA requires more than fraud against anyone who happens to receive money from the federal government" and that "the specific money or property" at issue must meet the requirements of section 3729(b)(2)(A)(ii).  Here, the level of government funding rose as needed to cover any difference between the GSEs' liabilities and the GSEs' assets.  Given this funding arrangement, there is no question that a sufficiently pleaded

---

[7] The limit to each GSE was originally $100 billion; it was raised to $200 billion in May 2009, and again per a formula based on deficiency amounts in another amendment in December 2009.  *See, e.g., Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement*, May 6, 2009, *available at* https://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2009-5-6_SPSPA_FannieMae_Amendment_508.pdf (last visited Sept. 4, 2018); *Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement*, Dec. 24, 2009, *available at* https://www.fhfa.gov/Conservatorship/Documents/ Senior-Preferred-Stock-Agree/2009-12-24_SPSPA_FannieMae_Amendment2_508.pdf (last visited Sept. 4, 2018).

11

complaint could establish that demands on the GSEs constitute a "claim" under the FCA.[8]

As the court noted in *Grubea*, "the [GSE] funds here are substantial and not earmarked, accordingly, it is not necessary to show that the funds were provided specifically to pay defendants' claims. Rather, the FCA applies as long as any portion of the claim is or will be funded by U.S. money . . . every dollar subtracted from the bottom line of the GSEs by fraud is potentially passed along to the government to the extent it results in or worsens a net shortly." *Grubea*, 2018 WL 3091255, at *19. The court concluded that "adopting a definition of 'claim' that would include the GSEs would not expand the FCA beyond Congress' intent, rather it would allow the Government to prosecute fraud on behalf of a taxpayer-supported entity that is in federal conservatorship – precisely what Congress had in mind when it amended the statute." *Id.*[9]

## B. The Standard for Materiality Under the FCA

Under the FCA, "materiality" means "having a natural tendency to influence, or be capable

---

[8] The funding arrangement with the GSEs is in stark contrast to the arrangements present in the *McCrary* and *McMahon* cases cited in defendant's motion to dismiss; those cases were dismissed because they failed to sufficiently plead a nexus to federal funds. *McCrary v. Knox Cty., Indiana*, 200 F. Supp. 3d 782, 792 (S.D. Ind. 2016) ("[h]is vague allegation that [defendant] receives some federal funding is not enough"); *United States v. McMahon*, No. 11 C 4620 (RMD), 2015 WL 115763, at *9 (N.D. Ill. Jan. 5, 2015) (plaintiff "fails to particularize how any HUD funding made its way into Defendants' hands").

[9] Defendant's motion to dismiss cites *United States ex rel. Todd v. Fidelity National Financial, Inc.*, 2014 WL 4636394, at *11 (D. Colo. Sept. 16, 2014) and *United States ex rel. Adams v. Wells Fargo Bank, N.A.*, No. 2:11-cv-00535-RCJ-PAL, 2013 WL 6506732 (D. Nev. Dec. 11, 2013), for the proposition that the GSE funding arrangement does not establish the requisite nexus between federal funds and losses to the GSEs. *Id*. at 19. For the reasons set forth above, *Todd* was wrongly decided. With regard to the *Adams* case, the Ninth Circuit specifically disclaimed the portion of the trial court's decision that defendant cites, noting that "[t]o the extent the district court broadly held that claims made to Freddie Mac and Fannie Mae could never be 'claims' within the FCA's definition of that term, the district court was mistaken." *U.S. ex rel. Adams v. Aurora Loan Servs. Inc.*, 813 F.3d 1259, 1260 (9th Cir. 2016).

of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Escobar*, the Supreme Court cited that definition and stressed that this was the same definition employed in "other federal fraud statutes," which came from "common law antecedents." *Escobar*, 136 S. Ct. at 2002. The Court explained that the basic concept of materiality is the same in all of these contexts, focusing upon "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. (quoting 26 R. Lord, *Williston on Contracts* § 69:12, at 549 (4th ed. 2003)). The Court stated that a matter is material if: (1) a reasonable person would attach importance to it in determining a choice of action, or (2) the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, regardless of whether a reasonable person would do so. *Id*. at 2002-03.

In defendant's motion to dismiss, the bank argues that relator failed to allege materiality, in part, because it says "materiality cannot be based upon an allegation that the defendant averred its compliance with an 'entire' set of statutory, regulatory or contractual requirements," and it asserts that relator's allegations of noncompliance with "certain underwriting standards," "underwriting guidelines," and "all applicable guide requirements" are too broad and unspecific. Defendant's Motion to Dismiss, at 21.[10]

The Supreme Court, however, did not hold that materiality *cannot* be based upon an allegation of noncompliance with an entire set of statutory, regulatory or contractual requirements. Rather, it rejected the argument that "*any* statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Escobar*, 136 S. Ct. at 2004 (emphasis added). Instead, it explained that

---

[10] This Statement of Interest does not take a position on whether relator's allegations adequately plead falsity or materiality.

13

a variety of factors are relevant to the materiality inquiry and stressed that no one factor is automatically dispositive. *Id*. at 2001 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). For example, such factors include whether the Government has labeled a requirement as a condition of payment, whether the matter goes to the "essence of the bargain," and whether "noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003-2004 and n. 5. Thus, the materiality determination does not turn on the breadth of a given statement, but rather on the importance of the requirement that the defendant allegedly failed to comply with, measured by factors such as those set forth in *Escobar*.

Moreover, defendant's citation to *U.S. Bank* is inapposite. *U.S. Bank*, a pre-*Escobar* decision, in fact found that relator's allegations that defendant did not comply with HUD's loss mitigation regulations successfully plead materiality. *See United States v. U.S. Bank, N.A.*, No. 3:13 CV 704, 2015 WL 2238660, at *5 (N.D. Ohio May 12, 2015). The portion of *U.S. Bank*'s opinion cited by defendant relates not to materiality, but rather to the question of the specificity needed to establish falsity of an express (as opposed to implied) certification. Furthermore, after *Escobar*, even under an express certification theory, falsity does not turn on the breadth of a defendant's certification. *See e.g.*, *Bishop v. Wells Fargo & Company*, 870 F.3d 104, 106 (2d Cir. 2017) ("although *Escobar* was an implied false certification case, it also abrogated [a prior holding's] particularity requirement for express false certification claims.").

### III. Conclusion

To the extent the court finds it necessary to reach the issue of whether a request or demand for money or property made to the GSEs may constitute a "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii), it should find in the affirmative. In addition, the United States requests that the court consider the United States' position regarding the materiality inquiry under *Escobar* in

14

assessing the allegations in relator's complaint.

>Respectfully submitted,
>
>JOSEPH H. HUNT
>Assistant Attorney General for the Civil Division
>
>JOHN R. LAUSCH, Jr.
>United States Attorney
>
>By: s/ Sarah J. North
>   SARAH J. NORTH
>  Assistant United States Attorney
>  219 South Dearborn Street
>  Chicago, Illinois 60604
>  (312) 353-1413
>  sarah.north@usdoj.gov
>
>MICHAEL D. GRANSTON
>JAMIE ANN YAVELBERG
>DEREK M. ADAMS
>Attorneys
>Civil Division
>175 N Street, N.E.
>Washington, D.C. 20530
>(202) 353-1079
>derek.m.adams@usdoj.gov

15